

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00007-CV

IN THE ESTATE OF LESLIE EARNEST HINES, DECEASED

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 42328-CCL

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

Following a bench trial, the trial court found that Brian Earnest Hilton was not the equitably adopted son of Leslie Earnest Hines. Hilton appeals, maintaining that (1) there was insufficient evidence to support the trial court's ruling that he was not Hines's equitably adopted son, and (2) contrary to the trial court's finding, Hilton proved, as a matter of law, that he was Hines's equitably adopted son. For the reasons below, we affirm the trial court's judgment.

## I.      Background

On July 24, 2018, Kathy Denise Fant filed an application for the appointment of a dependent administrator, for issuance of letters of dependent administration, and for determination of heirship, all relating to Hines's estate. On that same day, the trial court entered a judgment declaring heirship in Hine's estate[1] and entered an order granting letters of dependent administration to Fant. After letters of dependent administration were issued, and over a year after the original proceedings commenced, Hilton filed a motion for new trial, maintaining that, because he was Hines's equitably adopted son, he was an heir to his estate. The trial court granted Hilton's motion without a hearing. On October 30, 2019, the trial court held a second hearing to determine Hines's heirs. As it relates to this appeal, the trial court determined that Hilton was not Hines's equitably adopted son and, therefore, that Hilton was not an heir to Hines's estate. Hilton appeals.

---

[1]In its judgment declaring heirship, the trial court found that Hines was survived by his statutory heirs, including Hines's wife, sister, brother, nieces, and nephews. It also declared that Hines had $150,000.00 worth of real property and approximately $105,000.00 of personal property.

2

## II.    Discussion

In his first point of error, Hilton contends that there was insufficient evidence to support the trial court's verdict that he was not Hines's equitably adopted son.  In his second point of error, Hilton contends that, contrary to the trial court's finding, he proved, as a matter of law, that he was Hines's equitably adopted son.[2]  On both points of error, we disagree.

At the hearing to determine whether Hilton was one of Hines's heirs, Fant testified that Hines, who was her oldest brother, died intestate on October 15, 2016.  According to Fant, Hines had married his wife, Betty Jo Hines, in December 1979.  The couple never had any children of their own, but Betty Jo brought her own son, Hilton, into the marriage when Hilton was around ten years old.  Fant stated that, in her opinion, Hilton was not an heir to Hines's estate because Hines never adopted Hilton.  When asked if Hines and Hilton interacted as family, Fant responded, "I can't really answer that.  I mean, it's like with any other child. . . . Leslie was a generous man, let's just put it that way."  According to Fant, she did not believe Hilton was considered Hines's son.

Steve Waller, who had known Hines for over thirty years[3] and was Hines's neighbor, testified that Hines, Betty Jo, and Hilton seemed to be a family.  Yet, he also said that he had never seen Hines interact with Hilton.  According to Steve, he "guess[ed]" that Hines was Hilton's stepfather and that Hilton was Hines's stepson.  Steve also said that he never saw Hilton

---

[2]Because Hilton's two points of error are similar, we will address them together.

[3]Much of Waller's testimony corroborated Fant's testimony.

"bestow love and affection" on Hines. As far as Steve knew, Hines considered Hilton his "stepson maybe," but he was not sure.

Ressa Waller, who lived across the street from Hines, said she had known Hines for about thirty years. Ressa said that, other than Hines's sister, brother, nieces, and nephews, she was not aware of Hines having any other blood relatives. Ressa testified that Hines and Betty Jo raised Hilton, but when she was asked whether they functioned as his parents, Ressa said, "Well, I know Betty did." According to Ressa, she "guessed" Hines, Betty Jo, and Hilton acted like they were a family. Yet, she also stated, "I did not have a lot to do with them. I really couldn't be a judge." Ressa explained that she had seen Hilton outside playing basketball, but Ressa indicated, by shaking her head, that she had never seen Hines playing with Hilton.

Hilton testified that he began living with Hines when he was around ten years old and that he referred to Hines as "dad Hullie." According to Hilton, his biological father was Danny Hilton, and Hilton had had "[z]ero" role in his life. Hilton explained that Hines and Betty Jo raised him and that Hines disciplined him just like Betty Jo did. Hilton stated that he considered Hines to be his father and that he told family, friends, the community, school officials, and military officials that Hines was his father.

According to Hilton, Hines had made an agreement with Betty Jo to adopt Hilton. "One day they came to pick me up after school. Obviously, they had talked about it, [when] he presented it to me. I told him yes immediately." Hilton continued, "Then I didn't know how all that worked with this guy that was supposed to be my dad, my real dad, so I just told him to hold on." Hilton said that, if anyone had been apprehensive about the agreement, it would have been

4

him. According to Hilton, the other family members were aware that there was an agreement for Hines to adopt Hilton. When asked what names Hilton used in the community, he stated, Brian Hilton, Brian Hines, Ernie Hilton, and Ernie Hines.

Hilton also offered, and the trial court admitted, several birthday cards, Christmas cards, and Valentine's Day cards which, according to Hilton, showed that Hines had considered Hilton his son.[4] Likewise, Hilton presented newspaper clippings and documents that referred to Hilton as Ernie Hines and Betty Jo and Hines as Hilton's parents.[5] In support of Hilton's assertion that they were a family unit, Hilton presented several group photographs of Hilton, his wife, and child, Hines and Betty Jo.

Contrary to Fant's testimony, Hilton maintained that, during Hines's extended illness, he drove Hines to an out-of-town hospital for his medical appointments. At home, according to Hilton, he shopped for Hines, fed him, made sure he took his medication, and assisted him with his everyday personal needs. Hilton said that he did those things, explaining, "Because I am his son. We are his children and that's what we're supposed to do." Hilton also testified that his actions demonstrated love and affection and that they amounted to "performance by the child." According to Hilton, Hines, as well as the community, thought of Hilton as Hines's son.[6]

---

[4]Among other things, the greeting cards said, "Love, Mom and Hullie," "From both of us, Mom and Dad," and "Happy Birthday to a son the family always brags about." In general, the signatures on the cards were from "Mom and Hullie."

[5]Hilton's high school transcript referred to Hilton as Brian Earnest Hilton, but it delineated Hines and Betty Jo as his parents.

[6]At the time of the hearing, Hilton was living in the family's residence.

On cross-examination, Hilton conceded that he did not have a specific recollection as to when Hines agreed to adopt him. But he stated that he was "in elementary school or perhaps in middle school" when the agreement was made. In addition, Hilton was not aware of his father, Danny, ever agreeing to the termination of his parental rights. Moreover, Hilton stated that he was not aware of Danny agreeing, either orally or in writing, to Hines adopting him. Hilton conceded that, prior to making his claim in the heirship proceeding, he had not made any application in any court to be legally adopted by Hines. Likewise, Hilton was not aware of Hines ever filing a written application to adopt him.

According to Hilton, his father, Danny, died sometime in 2014. Danny's obituary, which had been published in the local newspaper, stated, in part, "Survivors include four sons and one daughter-in-law, Brian 'Ernie' and Jammie Hilton of Texarkana." Hilton said that he did not contact the newspaper to contest or dispute that reference, explaining, "I made a noise to myself, and I said whatever and dropped it."

Hilton also acknowledged that, in state documents, such as his driver's license, he was referred to as Hilton, not Hines. Likewise, his United States passport, his social security card, and his tax returns referred to him as Hilton and not Hines.

Jammie Danielle Hilton, Hilton's wife, testified that Hines referred to Hilton "[a]ll the time" as "son" or "Ern." She stated that Hilton referred to Hines as "my dad" or "Hullie." According to Jammie, Hines and Hilton spent a lot of time together doing various activities, such as woodworking. She said Hines was "very involved" with Hilton's 4-H functions when Hilton was in high school. Jammie explained, "They would -- we would all dye eggs at Easter. We'd

6

have get togethers, 4th of July, holidays. We'd come over and watch football . . . games, like the high school games together." Jammie testified that Hilton was known throughout the community as Brian Hilton, Ernie Hilton, Brian Hines, and Ernie Hines.

In further support of his position, Hilton provided a copy of a Facebook post from Hines to Jammie, which said, "Happy Birthday to a wonder [sic] daughter-in-law." There were several other posts wherein Hines referred to Jammie as his daughter-in-law or referenced himself as Jammie's father-in-law. In one post, Hines thanked Jammie, stating, "You have been a great daughter." According to Jammie, she also helped care for Hines during his illness.[7] Jammie conceded that the couple's various "acts of human kindness" toward Hines were not indicative of an agreement for Hines to adopt Hilton. She said, "It was because we loved him."

In addition, Jammie also testified that Hines treated her son, Manny, "like he was his blood grandson." Jammie said the child had stayed with Hines and Betty Jo since he was two weeks old and that he had his own room and his own clothes in their home. According to Jammie, Hines had taken out an insurance policy and Hilton was a contingent beneficiary. However, "no one ever got anything from the policy." Jammie stated that Hilton would not allow anyone to speak about his biological father and that Hines was the only person Hilton referred to as his father.

Jammie admitted that she had no knowledge of Hines ever filing a document agreeing to adopt Hilton. She testified, however, that Hines and Hilton had an oral agreement that Hines would adopt Hilton. Jammie stated that she had not been there when the agreement was made.

---

[7]When she was asked if Fant had assisted in Hines's care during his illness, Jammie replied, "No."

Jammie also stated that she had no knowledge of Hilton's biological father, Danny, ever agreeing to relinquish his parental rights to Hilton.

Julia Petty, who had known Hilton his entire life,[8] testified that she had heard Hines mention an agreement to adopt Hilton. Petty stated,

> We were talking and he said that they'd went to [Hilton] and [Hines] wanted to adopt [Hilton], but [Hilton], being young, not knowing any different, said something to the effect of if [Hilton] changed his name then nobody would know him anymore. And, so [Hines] said, well, we'll just wait. And we were sitting out in the living room and we were talking about it another time, [Hines] said, it's just a piece of paper, that's my son, this is my family. I don't need a piece of paper to tell me who my kid is or tell me who my son is. That's my son.[9]

As far as Petty knew, Hines had never signed any papers indicating that he had adopted Hilton or that he would adopt Hilton in the future. Petty explained, "Well, they said one day, hopefully one day." Petty conceded that, as far as she knew, that day never came.

In addition, Petty said Hines raised Hilton and that "anything you could possibly think of that a father would do with their son, that's what [Hines] did. He introduced him at church as his son. He introduced him to everybody, this is my son. [Hilton] said, this is my dad." According to Petty, Hilton loved Hines, and, when Hines got sick, "it was Jammie and [Hilton] that was taking care of him, to [the] full extent."[10]

After the trial court heard the testimony, reviewed the evidence, and considered arguments of counsel, it found that Hilton was not Hines's equitably adopted son, stating,

---

[8]Hilton was Petty's cousin by blood and also her brother-in-law.

[9]Petty said that Hines made the statements in 1991 or 1992, and then again in 1996.

[10]Several other witnesses testified that Hines and Hilton had a loving relationship, that Hines treated Hilton as if he were his son, and that Hilton treated Hines as if he were his father. Notably, none of those witnesses testified that they were aware of any agreement between Hines and Hilton that Hines would adopt him.

> So here I believe that there was some testimony about an agreement to adopt. However, an agreement to adopt must consist of a present promise to adopt as opposed to a mere desire or intention to adopt in the future, and I think that's the situation that we're in. There was no evidence presented that there was a present promise to adopt. So the Court will deny the application for equitable adoption and reestablish the heirship as previously testified and presented.

We agree with the trial court's determination and also find that Hilton was not Hines's equitably adopted son.

Adoption by estoppel takes place "when [a person's] efforts to adopt [a child] are ineffective because of failure to strictly comply with statutory procedures or because, out of neglect or design, agreements to adopt are not performed." *Spiers v. Maples*, 970 S.W.2d 166, 170 (Tex. App.—Fort Worth 1998, no pet.); *see In re Marriage of Eilers*, 205 S.W.3d 637, 641 (Tex. App.—Waco 2006, pet. denied) (explaining adoption by estoppel as recognized in Texas); *Luna v. Estate of Rodriguez*, 906 S.W.2d 576, 579 (Tex. App.—Austin 1995, no writ); *Pope v. First Nat'l Bank in Dallas*, 658 S.W.2d 764, 765 (Tex. App.—Dallas 1983, no writ) (doctrine applied regularly when, "because of the promises, acts and conduct of an intestate deceased, those claiming under and through him are estopped to assert that a child was not legally adopted or did not occupy the status of an adopted child"); *Bowden v. Caldron*, 554 S.W.2d 25, 27 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (citing *Heien v. Crabtree*, 369 S.W.2d 28 (Tex. 1963)). The doctrine of equitable adoption is not "the same as legal adoption" and does not contain "all of the legal consequences of a statutory adoption." *Eilers*, 205 S.W.3d at 641 (quoting *Heien*, 369 S.W.2d at 30). Rather, it merely protects an adopted "child's right to inherit by adoption" as if the adoption had been legally completed. *Spiers*, 970 S.W.2d at 170.

9

Courts in Texas have "long" recognized the doctrine of equitable adoption. *Pope*, 658 S.W.2d at 765; *Eilers*, 205 S.W.3d at 641. The Texas Estates Code recognizes the doctrine, defining "child" as including a person adopted by "acts of estoppel." TEX. EST. CODE ANN. § 22.004(a)(2).[11] For example, a child has been adopted by estoppel "when a natural parent delivers a child into the custody of others under an *agreement* between the parent and the custodians that the child will be adopted, and thereafter *the custodians and child live in relationship with that of parent and child*." *Luna*, 906 S.W.2d at 580. "In no case" has a court in Texas "upheld the adoptive status of a child in the absence of proof of an agreement or contract to adopt." *Lowrey v. Botello*, 473 S.W.2d 239, 241 (Tex. App.—San Antonio 1971, no writ) (quoting *Cavanaugh v. Davis*, 235 S.W.2d 972, 974 (Tex. 1951)). The agreement may be oral. *King v. Heirs & Beneficiaries of Watkins*, 624 S.W.2d 252, 255 (Tex. App.—Tyler 1981, writ ref'd n.r.e.). Adoption by estoppel must be proved by a preponderance of the evidence. *Moran v. Adler*, 570 S.W.2d 883, 885 (Tex. 1978).

Even though Texas recognizes the doctrine of equitable adoption, it has "done so only with caution and within certain well-defined boundaries." *Rubiolo v. McNees*, 301 S.W.2d 483, 485 (Tex. App.—El Paso 1957, writ ref'd n.r.e.). It exists to prevent "a situation where it would

---

[11]Section 22.004 states,

> (a) "Child" includes an adopted child, regardless of whether the adoption occurred through:
>> (1) an existing or former statutory procedure; or
>> (2) an equitable adoption or acts of estoppel.
> (b) The term "child" does not include a child who does not have a presumed father unless a provision of this code expressly states that a child who does not have a presumed father is included.

TEX. EST. CODE ANN. § 22.004.

be inequitable and grossly unfair to the adopted child, who has performed services and rendered affection, for the adoptive parent or his privies to deny the adoption." *Id*. Yet, adoption by estoppel is not a statutory doctrine. *Cubley v. Barbee*, 73 S.W.2d 72, 81 (Tex. 1934). Instead, it is a judicially created equitable doctrine. *Id*.

Hilton had the burden to prove the existence of an equitable adoption by a preponderance of the evidence. *Moran v. Adler*, 570 S.W.2d 883, 885 (Tex. 1978). Therefore, we interpret Hilton's claims on appeal as follows: The trial court erred when it found that Hilton was not Hines's equitably adopted son because Hilton presented legally[12] and factually sufficient[13] evidence to support a finding that he was, in fact, Hine's equitably adopted son.[14]

At the hearing, Hilton presented an abundance of evidence showing that he considered Hines to be his father, that, at least on some occasions, Hines referred to Hilton as his "son," and

---

[12]In determining legal sufficiency, we consider only the evidence and inferences that tend to support the trial court's findings and disregard all evidence and inferences to the contrary. *Valdez v. Valdez*, 930 S.W.2d 725, 730 (Tex. App.—Houston [1st Dist.] 1996, no writ). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenge goes to the weight to be given to the evidence. *Spiers*, 970 S.W.2d at 170. We will uphold the trial court's finding if there is some evidence to support it. *Id*. Stated differently, we will uphold the trial court's finding when the proof supplies a reasonable basis on which reasonable minds could reach different conclusions about the existence of the fact. *Id*. (citing *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992) (per curiam)).

[13]When a party who has the burden of proof attacks the factual sufficiency to support an adverse finding, he must demonstrate that the finding is against the great weight and preponderance of the evidence. *Mohnke v. Greenwood*, 915 S.W.2d 585, 589 (Tex. App.—Houston [14th Dist.] 1996, no writ). When making this determination, we consider the entire record and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985).

[14]As in this case, when a trial court does not issue findings of fact and conclusions of law, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers Cty., Tex.*, 922 S.W.2d 945, 948 (Tex. 1996). Yet, when a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising both factual and legal sufficiency of the evidence issues. *BMC Software Belgium N.V. v. Marchand*, 83 S.W.3d 789, 790 (Tex. 2002). When such points are raised, the applicable standard of review is the same as that to be applied when reviewing a jury's findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam). The trial court's "judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

that Hines spent a significant amount of time with Hilton. Likewise, there was evidence to show that Hines, Hilton, and Betty Jo presented themselves to the public as a family. Most notably, Hilton presented evidence showing that Hines cared a great deal about him. Yet, to establish that there was an agreement, Hilton was required to prove that Hines (1) executed "a statutory instrument of adoption in the office of the county clerk"; (2) attempted to complete the statutory adoption but failed "to do so because of some defect in the instrument of adoption, or in its execution or acknowledgment"; or (3) agreed with "[Hilton] to be adopted, or with [Hilton]'s parents, or some other person *in loco parentis* that he . . . would adopt [Hilton]." *Lowrey v. Botello*, 473 S.W.2d at 241. Certainly, the first two requirements are not relevant to this case. Instead, the question before the Court is whether an agreement to adopt existed between the parties, i.e., between Hines and Hilton, between Hines and his biological father, Danny, or between Hines and his mother, Betty Jo. *See Cavanaugh v. Davis*, 235 S.W.2d 972, 973–74 (Tex. 1951).

The record established that Danny never entered into a written or oral agreement with Hines allowing Hines to adopt Hilton. Likewise, there was no evidence that Betty Jo agreed to Hines's adoption of Hilton. That said, there was some evidence that Hines had potentially intended to adopt Hilton sometime in the future. According to Hilton, Hines had discussed with him the possibility of adoption when he was younger, but no agreement was made at the time, and Hines and Hilton chose to put off the issue of adoption until a later date. Likewise, Petty testified that Hines told her that he wanted to adopt Hilton, but because of an issue regarding the possibility of Hilton's name being changed, the matter was dismissed. And contrary to Petty's

12

initial testimony, she also said that Hines had told her that he did not "need a piece of paper to tell [him] who [his] kid [was] or tell [him] who [his] son [was]," which is evidence that Hines never intended to adopt Hilton. Regardless, in Hines's conversations with all of those witnesses, there was no evidence that Hines ever followed-up by actually entering into an agreement to adopt Hilton. Moreover, many of the witnesses testified that they had no knowledge of the existence of an agreement for Hines to adopt Hilton.

Because there was some evidence to support the trial court's finding that no agreement to adopt Hilton existed between Hines and Hilton, or Hines and Hilton's parents, we find that the evidence was legally sufficient to support the trial court's finding. As to the factual sufficiency, we have reviewed all of the evidence presented to the trial court, and after reviewing the evidence, we cannot say that evidence contrary to the trial court's finding was so overwhelming as to render the finding manifestly wrong or unjust. While Hilton presented evidence of his close relationship with Hines, that emotional bond alone does not support a finding of adoption absent evidence of an agreement or contract to adopt Hilton. As a result, the trial court had legally and factually sufficient evidence to make its finding and, therefore, it did not err when it found that Hilton was not the equitably adopted son of Hines.[15]

---

[15]In her brief, Fant contends that we should not address Hilton's first complaint because he either incorrectly stated the evidentiary standard of review or he waived the issue for appellate review. Finding in favor of Fant on the substantive issues, we find it unnecessary to address those arguments.

**III.** **Conclusion**

We overrule Hilton's points of error and affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted: July 27, 2020
Date Decided: October 8, 2020

14